**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-445 (CKK)** |
| | : | |
| **ANDREW ALAN HERNANDEZ,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Andrew Alan Hernandez to 18 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.      INTRODUCTION

The defendant, Andrew Alan Hernandez ("Hernandez"), participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

**FACTUAL BACKGROUND**

**A.      The January 6, 2021, Attack on the Capitol**

To avoid unnecessary discussion, a brief description of the January 6, 2021 assault on the United States Capitol on January 6, 2021 by a mob of thousands of rioters is set forth in the Statement of the Offense, ECF No. 46, at ¶¶ 1-7.

**B.      Defendant's Role in the January 6, 2021, Attack on the Capitol**

*Approach to the Capitol*

Andrew Hernandez, a forty-five-year-old former Marine and construction worker, participated in the January 6 attack on the Capitol. His crime is documented through a series of videos obtained by the FBI, open-source photos/videos, photographs from Hernandez's cellphone, and surveillance footage from inside of the Capitol.

On or about January 5, 2021, Hernandez flew to Washington, D.C. from Phoenix, Arizona, where he was working on a construction project.  Hernandez joined a large group of people who had gathered for the "Stop the Steal" rally and thereafter, made his way to the East side of the U.S. Capitol. Video footage captured a large group of rioters shouting at U.S. Capitol police as they manned a perimeter of metal racks set up to keep individuals from entering the grounds close to the U.S. Capitol. *See* Exhibit No. 1 (a compilation of videos containing footage from the East side of the U.S. Capitol).[2]

At approximately 1:57:57 p.m., individuals in the crowd pushed down the metal barricades, first on the northeast side and then at 1:58:12 p.m. the barriers directly east of the U.S. Capitol. *Id.*

---

[2] The government anticipates providing video exhibits to the Court prior to the sentencing hearing.

(bottom video). Rioters swarmed over and around the metal barricades, causing police, who were grossly outnumbered, to retreat to the bottom of the stairs below the Rotunda doors. *Id*. At approximately 1:58:41 p.m., Hernandez can be seen in the video as he rounded the metal barricades moments after they had been pushed down. *Id*. at 1:58:41 (bottom video).



Photo No. 1 above is a screen shot from Exhibit No. 1 (bottom video) showing Hernandez (circled) at approximately 1:58:41 p.m. as he goes around the metal barricade moments after it was breached. Hernandez wears a backpack, hat and a blue Trump flag tied around his neck. He is holding an American flag on a pole.[3]

Hernandez and the crowd of rioters then followed the U.S. Capitol police as they lined up at the bottom of the stairs to defend the U.S. Capitol. Hernandez can be seen in the upper left video entering the screen at approximately 1:59:33 p.m. and walking towards the police line.

---

[3] When Hernandez's residence was searched pursuant to a search warrant, agents recovered, amongst other things, a backpack containing a medical kit and zip-ties.



Photo No. 2 above is a screen shot from Exhibit No. 1 (upper left video) at 1:59:47 p.m. Hernandez (circled) walked towards the stairs below the Rotunda door.

Rioters then swarmed the base of the stairs. *Id*. Officers were assaulted. *Id*. (upper

left video).



Photo No. 3 above is a screen shot from Exhibit No. 1 (lower left video) at approximately

1:59:57 p.m.



Photo No. 4 above is a screen shot from Exhibit No. 1 (upper right video) at approximately 2:04:38 p.m. Officers being confronted by rioters on the stairs.

Within approximtely five minutes after the rioters began pushing and shoving officers who were trying the prevent them from entering the Capitol, the rioters were able to break the line and swarm towards the Rotunda doors. Another video from outside the Rotunda doors captured Hernandez as he quickly made his way up the stairs. *See* Exhibit No. 2 (video from outside the Rotunda doors). A woman can be heard in Exhibit No. 2, yelling, "They're pushing up!" "Step-by-step!" and "Watch your eyes. They're macing."



Photo No. 5 above is a screen shot from Exhibit No. 2, approximately 36 seconds into the video. Hernandez is circled going up the stairs.

Police retreated to the immediate area outside the Rotunda doors. Hernandez made his way close to the front of the crowd trying break into the U.S. Capitol. Although investigators have uncovered no evidence that Hernandez made direct contact with any police officer outside of the Rotunda door, he is visible in videos approximately one to two persons removed from officers as they were being pushed and shoved. *See* Exhibit No. 2.1. That means that he was part of the mob of rioters whose body mass enabled them to overcome the vastly outnumbered police attempting to secure the Capitol against a breach. In addition, Hernandez's movement through the crowd of rioters provided him with a front row seat to assaults on police officers, the breaking of windows, and the deployment of pepper spray. *See* Exhibit Nos. 1, 2, 2.1, 3, and 3.1.



Photo No. 6 above is a screen shot from Exhibit No. 4, at approximately 2:26:45 into the video. The photo shows Hernandez's proximity to police officers who were being assaulted. Hernandez is circled.

While the crowd pushed towards the Rotunda doors, rioters repeatedly yelled, "Stop the Steal! Stop the Steal! Stop the Steal!" *See* Exhibit 2.1 As can be seen below, Hernandez smiled as people in the crowd shouted, "Bang that door!" "Bang that door!"



Photo No. 7 above is a screen shot from Exhibit No. 2.1, approximately 6.55 minutes into the video. Hernandez (circled) is outside the Rotunda door.

Hernandez is visible in Exhibit No. 3 (a video showing rioters outside the Rotunda doors) prior to

the doors being opened. Several police officers tried to keep rioters from getting inside but were overwhelmed. *Id*. Rioters were able to grab officers' shields as they tried to keep the rioters from the doors. *Id*.



Photo No. 8 above is a screen shot of the back of Hernandez's head from Exhibit No. 3, approximately 21 seconds into the video.

Another video shows a different perspective – from outside and inside the Rotunda doors. *See* Exhibit No. 4 (compilation of videos). At approximately, 2:35 p.m., a group of rioters (who had made their way into the U.S. Capitol) were pushing and shouting for the Rotunda doors to be opened. Officers were assaulted and overwhelmed. *Id*. Inside rioters were successfully able to open the Rotunda doors. Outside rioters, including Hernandez, swarmed inside. *Id*. At approximately 2:40 p.m., moments after the East Rotunda doors were breached, Hernandez entered the Capitol right past the police. *See* Exhibit No. 5 (video from inside).



Photo No. 9 above is a screen shot from a surveillance video, Exhibit No. 5, which shows Hernandez (circled) as he entered the Rotunda Doors at approximately 2:40:17.

Hernandez shouted along with the crowd as he entered and then went up the stairs to the south of the door – away from the Rotunda. Investigators have been unable to determine what, if anything, Hernandez shouted as he entered the Capitol. In at least one video, however, the crowd repeatedly shouted, "Treason!" *See* Exhibit No. 4.



9

Photo No. 10 above is a widely published photograph in which Hernandez (circled) was going up the stairs (Gettyimages/Win McNanamee).

After reaching the top of the stairs, Hernandez went down a few hallways until he reached the doors to the Senate Gallery. Moments prior to Hernandez's entry into that hallway, security guards attempted to secure the Senate gallery doors, but were confronted by other rioters. Some of the rioters assaulted the security guards, who were outnumbered. *See* Exhibit No. 6 (surveillance video). Hernandez did not participate in the assault and arrived in the hallway just moments after the confrontation. As Hernandez entered the hallway he looked to the right (as did other rioters), which was in the direction the security guards had just retreated.



Photo No. 11 above, a screen shot from Exhibit No. 6 which shows Hernandez (circled) as he entered the hallway outside the Senate Gallery doors. Hernandez's head is turned to the right where moments earlier there was a confrontation between rioters and U.S. Capitol security.

Hernandez, along with other rioters, then immediately entered the Senate Gallery. *See* Exhibit No. 7 (video from another rioter inside the Senate Gallery).



Photo No. 12 above is a screen shot from Exhibit No. 7. Hernandez (circled) is wearing sunglasses, holding the American flag and a go-pro camera.

After entering the Senate Gallery, Hernandez moved down several steps towards the railing overlooking the floor of the Senate Chamber. While Hernandez stood in the Senate Gallery, others yelled, amongst other things, "Treason!" Hernandez was inside the Senate Gallery from approximately 2:43 p.m. to 2:45 p.m. and took "selfies" of himself inside the Senate Gallery.



Photo No. 13 above. "Selfie" of Hernandez in the Senate Gallery retrieved from Hernandez's cell

phone.

Hernandez then went out the Senate Gallery door and down the corridor. He proceeded down the stairs and left the Capitol through the Rotunda door at around 2:51 p.m. In total, Hernandez was in the Capitol for approximately 14 minutes.

### *Hernandez's Statements*

FBI analysts found several social media accounts associated with Hernandez. On November 6, 2020, Hernandez posted, that "If people do not fight now go out and protest the vote/election fraud. Than [sic] your voting days are over. They are trying to steal the vote and will perfect and protect their fraudulent voting system when in power. . . You will have a tyrannical dictatorship. Fight Fight Fight."



On January 1, 2021, Hernandez posted the following:



Following January 6th, Hernandez expressed no remorse for his participation in storming the Capitol and obstructing Congress in certifying the Electoral College vote. Specifically, on January 11, 2021, Hernandez posted, "THE ELECTION WAS FRAUD!"



## II.   THE CHARGES AND PLEA AGREEMENT

On June 30, 2021, a federal grand jury returned a six-count Indictment charging Hernandez with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One), Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1) (Count Two), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three), Entering and Remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B) (Count Four), Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five), and Parading Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six).

On September 21, 2022, Hernandez pled guilty to Count One, Obstruction of an Official

Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2.

## III.   STATUTORY PENALTIES

Hernandez now faces sentencing on Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2. As noted by the plea agreement and the U.S. Probation Office, Hernandez faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count One, Obstruction of an Official Proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2. *See* ECF No. 47 (plea agreement), and ECF No. 51 (Pre-Sentence Report or "PSR"), ¶ 4.

## IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The plea agreement contains the following stipulated Guidelines calculation for this case:

Count One (18 U.S.C. §§ 1512(c)(2) and 2:

|  |  |  |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[4] | <u>+3</u> |

---

[4] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court

| | | |
|---|---|---|
| **Total** | **17** | |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-3</u> |
| **Total Adjusted Offense Level:** | **14** | |

*See* ECF No. 47 at ¶ 5(A). The Probation Office's Guidelines calculations mirrors the parties' stipulated calculations. ECF No. 51 at ¶¶ 24-34.[5]

The Probation Office calculated Hernandez's criminal history as category I, which is not disputed. *See* ECF No. 51 ¶¶ 35-41. Accordingly, based on the parties' stipulated Guidelines calculation, the advisory Guidelines imprisonment range is 15 to 21 months' incarceration.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of

---

resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Hernandez admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

[5] Based on the facts and circumstances of Hernandez's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because a sentence within the Guidelines range of 15-21 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

To be clear, had Hernandez personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Hernandez's part is therefore not a mitigating factor.

The nature and circumstances of this defendant's crime weigh, including his joining a mob of rioters who violently breached the Rotunda Doors on the east side of the Capitol, moving deep inside the Capitol Building all the way into the gallery of the Senate Chamber, his inflammatory social media posts before and after January 6, and his utter absence of remorse for his conduct, fully supports a significant term of incarceration within the stipulated Guidelines range.

### B.  Hernandez's History and Characteristics

Hernandez is a 45-year-old former Marine from Riverside, California. Hernandez is married but legally separated, with two adult children and an adult stepchild. PSR ¶¶ 46-47. Hernandez obtained his high school diploma. *Id*. ¶ 56. He attended Cypress College in Cypress, California, but did not earn a degree. *Id*. As set forth in the PSR, Hernandez has no criminal history. *Id*. ¶¶ 35-41.

The PSR suggests that Hernandez does not appear to have a drug or alcohol problem, however, he does consume both alcohol and marijuana on a regular basis. *Id*. ¶¶ 54-55. Hernandez

joined the U.S. Marine Corps on active duty in 1996 and was discharged in 1997 but continued to serve as a reservist until 2004. *Id*. ¶ 57. Hernandez is currently unemployed, having been fired from his construction job as a result of his wearing company apparel at the time of the instant offense. *Id*. ¶¶ 59-61. The PSR does not suggest that Hernandez was mentally and/or emotionally incapable of avoiding his criminal conduct; instead, he chose to follow without evidence, false election claims and, as a result, engaged in criminal conduct. *Id*. ¶¶ 51-53.

Hernandez has been compliant with the conditions of pretrial release and has not had any issues. While the recovery of a medical kit and zip-ties in Hernandez's backpack during the execution of the search warrant suggests some preparation for violence, there is no evidence that Hernandez used those items or that they were in his backpack during the riot.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Hernandez's criminal conduct, corruptly obstructing of an official proceeding, is the epitome of disrespect for the law.

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                    at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of Hernandez's offense demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol

---

[7] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants — especially those who intend to improperly influence the democratic process — that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. When faced with an election outcome Hernandez did not like, he indulged in a fantasy, without any evidence, for why the election didn't count. He then acted on this fantasy, joining a flood of rioters who took over the U.S. Capitol and accomplished a goal many could never have imagined — halting the peaceful transfer of power upon which our democracy is built. Moreover, other than Hernandez's guilty plea, there is no indication that Hernandez is remorseful for his criminal activity, the assault on the U.S. Capitol, and his participation in impeding the fundamental role of Congress in certifying the vote of the Electoral College.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).

### F.     Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6) — the need to avoid unwarranted sentencing disparities — the crime that Hernandez and others like him committed on January 6 are

unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord *United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

If this Court nevertheless elects to compare the sentences of other, similarly situated January 6 defendants with this case, it will see that the government's recommendation of a sentence within the stipulated Guidelines range would not result in an unwarranted disparity. The government submits that the most relevant comparisons to this case are other January 6th

defendants who entered either the Senate Gallery or the Senate Chamber and were convicted of violating § 1512(c)(2).

For instance, this Court recently conducted the sentencing hearing in the case of *United States v. Tommy Allen*, 21-cr-64-CKK. Prior to January 6, 2021, Allan's Facebook posts were filled with claims that the 2020 election had been stolen and that violence was needed on January 6th to stop the transfer of power to the incoming administration. For example, Allan posted, ""I will do all in my power to prevent Fraudulent Beijing Biden and the CCP from taking over my country. I'm not done fighting! On the contrary, I'm marching to the battlefield."

On January 6, 2021, about 2:45 p.m., Allan entered the building through the Parliamentarian Door, just minutes after the first rioters broke in. After going into the Parliamentarian Office for about a minute, he and other rioters entered the Capitol through the North Door adjacent to the Appointment Desk. Inside the Capitol, Allan stole a United States flag. Like Hernandez, Allan took advantage from the actions of other rioters who broke the police line as Allan entered the Senate Chamber at about 3:03 p.m. Allan continued walking around the Senate Chamber until about 3:08 p.m., when officers arrived to force empty rioters from the Chamber. While there, Allan noticed paperwork left there by the Senate staff who had evacuated the Chamber. Allan took some of the papers. Upon entry, Allan raised his fist in celebration. This Court sentenced Allan to a term of 21 months' incarceration.

In *United States v. Christine Priola*, 22-cr-242-TSC; the defendant joined the front lines of the riot and entered the Capitol building soon after other rioters overcame the police officers guarding the East Rotunda doors. Priola carried a large sign reading, "WE THE PEOPLE TAKE BACK OUR COUNTRY" on one side and "THE CHILDREN CRY OUT FOR JUSTICE" on the

other side. Once in the building, Priola made her way to the Senate floor. While there, Priola spoke to an associate by telephone and encouraged that person to come inside either the Capitol or the Senate Chamber, saying it was "now or never." Like Hernandez, Priola declined to be interviewed by law enforcement officers during the execution of a search warrant at her residence on January 9, 2021. Sometime before January 13, Priola deleted from her cellular telephone photos, videos, chats, and messages regarding her activities on and around January 6th. From a Guidelines range of 15 to 21 months, Judge Chutkan sentenced Priola to 15 months' incarceration and 12 months' supervised release.

In *United States v. Jacob Chansley*, 21-cr-3-RCL, the defendant entered the Capitol from the West side at around 2:14 p.m. and was among the first rioters to enter through the Senate Wing Door. He confronted police outside the Senate and carried a bullhorn to rile up the crowd. At around 2:52 p.m., Chansley entered the Senate Gallery (after Hernandez), screaming obscenities, and then proceeded down a staircase to enter the Chamber itself. While there, Chansley occupied the dais and led the rioters in an incantation. Chansley faced a higher sentencing range than Hernandez – 41 to 51 months – because he received an enhancement for threatening to cause physical injury. Also unlike Hernandez, Chansley demonstrated extraordinary acceptance of responsibility by affirmatively contacting law enforcement officials and agreeing to speak with them almost immediately after the attack. On January 7, 2021, Chansley called the FBI to identify himself, and drove on January 9, 2021, to an FBI field office to continue his interview, at which time he was arrested. Chansley was also, like Hodgkins, but unlike Hernandez, one of the first January 6th defendants to accept responsibility and plead guilty. Chansley also presented documentation regarding a mental health problem. Ultimately, Judge Lamberth determined that

despite the factors in Chansley's favor, the "horrific" nature of the crime led him not to downwardly depart, and to impose a sentence of 41 months' incarceration.

## VI.  RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[8] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol. *See* ECF No. 47 at ¶ 12. Hernandez has agreed to pay $2,000.00 in restitution and his restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See Id*., PSR ¶ 86.

## VII.  CONCLUSION

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Hernandez to 18 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:    */s/ Diane G. Lucas*
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street NW
Washington, DC 20350
202-252-7724
Diane.Lucas@usdoj.gov

25